UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 25-272 (JRT/DJF)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

VANCE LUTHER BOELTER,

        Defendant.

**THE GOVERNMENT'S POSITION ON SENTENCING**

DANIEL N. ROSEN
United States Attorney

Bradley M. Endicott
Matthew D. Forbes
Assistant United States Attorneys

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 3

BACKGROUND ................................................................................................................. 4

    I.    Boelter murdered the Hortmans and attempted to murder the Hoffmans and two other state legislators. ..................................................................................... 4

        A.  *Boelter attempted to murder the Hoffmans.* ....................................................... 4

        B.  *Boelter attempted to murder Representative Bahner.* ........................................ 5

        C.  *Boelter attempted to murder Senator Rest.* ........................................................ 5

        D.  *Boelter assassinated Speaker Hortman and murdered her husband Mark.* ...... 6

    II.   Boelter fled toward his home in Green Isle, where he was arrested. ...................... 8

        A.  *Boelter fled toward his family home in Green Isle.* ........................................... 8

        B.  *Law enforcement conducted a successful statewide manhunt.* .......................... 11

    III.  Investigation revealed Boelter acted alone and thoroughly prepared for the assassinations. .................................................................................................. 13

    IV.  Boelter falsely claimed he shot at the Hoffmans' feet and arms. ......................... 15

SENTENCING GUIDELINES ......................................................................................... 16

    I.    The Guidelines recommend a sentence of life plus a consecutive 20-year term. ... 16

    II.   Federal law authorizes two consecutive life terms plus a consecutive 40-year term, as recommended by the parties. ......................................................................... 17

THE APPROPRIATE SENTENCE .................................................................................. 20

    I.    Boelter's crimes are among the most serious ever presented to the Court. ........... 20

        A.  *Boelter's murders and attempted murders had a devastating effect on the victims.* ........................................................................................................ 20

        B.  *Boelter committed political assassination.* ...................................................... 25

        C.  *Boelter sought to kill more state legislators.* ................................................... 27

        D.  *Boelter pointed a firearm at police and threatened law enforcement.* ............ 28

        E.  *Boelter falsely minimized his attempts to kill the Hoffmans.* ........................... 29

    II.   General deterrence requires the lengthiest term of imprisonment. ........................ 29

    III.  The requested sentence is necessary to avoid sentencing disparities. .................... 30

CONCLUSION .................................................................................................................. 31

## **INTRODUCTION**

Vance Boelter committed an assault on democracy.  Using the worst form of political violence—political assassination—he murdered Speaker Melissa Hortman and her husband Mark.  He attempted to murder Senator John Hoffman, his wife Yvette, and his daughter Hope.  He tried to kill Representative Kristin Bahner and Senator Ann Rest.  And he likely sought to kill more legislators.

Political violence is a national scourge.  Heinous assassinations and other acts of political violence in the United States have dramatically increased in recent years.  The United States has zero tolerance for political violence, especially homicidal political violence, regardless of the political affinity of the perpetrators.

Boelter's motive was political.  He expressed great disdain for the political party he opposed.  He was focused on a political protest scheduled at the Minnesota State Capitol on June 14, 2025.  And he knew that the Minnesota Legislature was so closely divided that by killing four state legislators, the inevitable result would be a shift in the balance of power in both legislative houses.

Boelter's crimes are among the most serious ever committed in the District of Minnesota.  He shattered the lives of his victims.  He terrified Minnesota's public servants.  He threatened police and pointed a gun at an officer.  He viciously attacked the organs of Minnesota's representative government.

Justice requires the greatest term of imprisonment permitted by law.  Boelter should be sentenced to two consecutive life terms with an additional 40-year consecutive term.

## BACKGROUND

I.   **Boelter murdered the Hortmans and attempted to murder the Hoffmans and two other state legislators.**

   *A. Boelter attempted to murder the Hoffmans.*

At approximately 2:00 a.m. on June 14, 2025, Boelter drove his black SUV equipped with law-enforcement style emergency lights to the home of Senator John Hoffman and his family in Champlin, Minnesota. (Presentence Investigative Report ("PSR") ¶ 8, June 15, 2026, ECF No. 54.) Boelter was dressed to impersonate a law enforcement officer. (*Id.*) He wore a black body-armor vest, carried a flashlight, and concealed his entire face and head with a silicone mask. (*Id.*) Boelter approached the home, pounded on the door, and repeatedly shouted, "This is the police, open the door." (*Id.*) Senator Hoffman answered the door with his wife Yvette Hoffman. (*Id.*) Their daughter Hope Hoffman came to the door with them too. (*Id.*)

Boelter was allowed into the entryway of the Hoffman home and falsely stated that a shooting had been reported. (*Id.*) Boelter asked whether the Hoffmans had any guns. (*Id.*) Senator Hoffman said no. (*Id.*) At that moment, the Hoffmans realized Boelter was wearing a mask. They confronted him about not being a real police officer. (*Id.*) Boelter responded, "This is a robbery," and ordered the Hoffman family to put their hands up. (*Id.*) He pointed a nine-millimeter semiautomatic handgun at them. (*Id.*)

Senator Hoffman attempted to push Boelter backwards through the front doorway. (*Id.*) Yvette tried to shut Boelter outside by closing the door on him. (*Id.*) Boelter then fired at least nine gunshots through the door at the Hoffman family, leaving nine bullet holes in the door. Senator Hoffman was struck by at least three rounds. (*Id.*) He suffered

4

wounds to the chest, torso, his left finger, his left elbow, his face, intestines, kidney, and liver. (*Id.*)  Yvette was struck by six rounds in the abdomen, hip, arm, and wrist. (*Id.*) Hope was not shot. (*Id.*)

Boelter fled in his SUV, as Hope called 911 at 2:06 a.m. (*Id.*)  Law enforcement and paramedics quickly responded and initiated medical treatment. (*Id.*)  Senator Hoffman and Yvette were both hospitalized with serious injuries, and survived Boelter's attempt to murder them. (*Id.*)

### B.    Boelter attempted to murder Representative Bahner.

After Boelter left the Hoffmans' house, he traveled to the home of Representative Kristin Bahner in Maple Grove, Minnesota. (*Id.* ¶ 9.)  Boelter arrived at Bahner's house at 2:26 a.m. in his SUV. (*Id.*)  He walked up to the front door and said, "Open the door, this is the police, open the door." (*Id.*)  Nobody responded—Bahner and her family were not home. (*Id.*)  Boelter left in his SUV. (*Id.*)

### C.    Boelter attempted to murder Senator Rest.

Less than 10 minutes later, Boelter arrived in his SUV at the home of a Minnesota State Senator Ann Rest in New Hope, Minnesota. (*Id.* ¶ 10.)  While he sat in his SUV, a New Hope police officer arrived to conduct a welfare check on the senator after hearing of a shooting at Senator Hoffman's home. (*See id.*)  The officer observed the SUV equipped with law-enforcement-style emergency lights parked on the street outside Senator Rest's home.  (*Id.*)   The officer—who had not heard that the Hoffmans' shooter was impersonating police—believed the SUV was likely an unmarked Minnesota State Patrol vehicle conducting dignitary protection detail for Senator Rest. (*Id.*)

The officer stopped next to Boelter's SUV and attempted to communicate with him. (*Id.*) They each rolled down their vehicle windows. (*Id.*) The officer asked Boelter, "Hey, are you good?" (*Id.*) Boelter did not respond. (*Id.*) He stared straight ahead. (*Id.*) The officer continued onto Senator Rest's residence. (*Id.*) The senator was home, and her house had not been disturbed. The officer then noticed the SUV had left. (*Id.*)

**D.      *Boelter assassinated Speaker Hortman and murdered her husband Mark.***

At approximately 3:30 a.m., Boelter arrived in the SUV at the home of Minnesota State Representative and Speaker Emerita Melissa Hortman in Brooklyn Park, Minnesota. (*Id.* ¶ 11.) He parked in the driveway. (*Id.*) He exited the SUV, leaving the law-enforcement style emergency lights flashing. (*Id.*) Still disguised as a law-enforcement officer, this time wearing a wig in addition to a mask, Boelter rang the front doorbell and shouted, "Police, welfare check." (*Id.*) Speaker Hortman's husband, Mark, answered the door. (*Id.*) Boelter shined a flashlight in Mark's face and stated there had been reports of shots fired. (*Id.*) Mark denied any knowledge of a shooting, stating at one point, "Good god, I was asleep." (*Id.*)

Boelter asked who else was inside the house. (*Id.* ¶ 12.) When Mark responded that only his wife was there, Boelter said, "I need to see her before I go." (*Id.*) Mark called into the house, "Melissa, they need to see you." (*Id.*) Mark told Boelter, who remained outside the door shining a flashlight, "We can't see you." (*Id.*) Mark asked for Boelter's name and badge number. (*Id.*) Boelter responded with a fake name and badge number. (*Id.*) Mark asked, "What jurisdiction are you?" (*Id.*) Boelter hesitated before responding, "Uh—Maple Grove." (*Id.*)

While Boelter's back-and-forth with Mark was occurring, a Brooklyn Park police officer arrived to conduct a welfare check. (*Id.* ¶ 13.) The officer parked in the driveway next to Boelter's SUV. (*Id.*) The officer saw the law enforcement-style emergency lights flashing on the SUV, and Boelter in police attire holding a flashlight and talking with Mark, and was initially confused as to what was happening. (*Id.*)

Boelter quickly noticed the officer's arrival. He brandished and pointed a nine-millimeter semiautomatic handgun at Mark. (*Id.* ¶ 14.) Boelter shot the gun six times at Mark. (*Id.*) Two of those gunshots struck Mark in the side and the back as Mark was turning away from Boelter. (*Id.*) Mark fell in the entryway. (*Id.*) At the same time that Boelter was firing, the Brooklyn Park officer—now realizing what was happening—started shooting at Boelter, but Boelter was not struck as he rushed into the Hortman residence. (*Id.*) The officer lost sight of Boelter. (*Id.*)

As Boelter entered the residence, he encountered Speaker Hortman as she stood on a landing midway up a stairwell. (*Id.* ¶ 15.) She was with the Hortman family dog. (*Id.*) Boelter rushed into the house and up the stairs, firing eight gunshots at Speaker Hortman as he went upstairs to pursue her. (*Id.*) At least seven of the shots struck her, in the chest, breasts, torso, abdomen, thighs, and head. (*Id.*) Regarding the shot to Speaker Hortman's head, Boelter had pressed the gun to her head and fired. (*Id.*) The entire shooting lasted seconds.

Boelter's gunshots also hit the Hortmans' dog, who was critically injured. (*Id.* ¶¶ 15, 16.) The dog was euthanized due to its significant injuries. (*Id.*)

**II.    Boelter fled toward his home in Green Isle, where he was arrested.**

   *A.    Boelter fled toward his family home in Green Isle.*

After Boelter murdered the Hortmans, he fled the home through a backdoor.  (*Id.* ¶ 16.)  Brooklyn Park police officers were still positioned in front of the residence.  (*Id.*) They pulled Mark Hortman out of the home, as paramedics and additional law enforcement responded.  (*Id.*)  Out of concern that Boelter may have barricaded himself in the home while armed, the officers cleared the home using drones.  (*Id.*)  Officers then entered the home and found Speaker Hortman deceased on the stairway landing.  (*Id.*)  Mark Hortman received medical treatment but did not survive.  (*Id.*)

After Boelter fled out the back of the Hortmans' home, he traveled along a public walking path next to a golf course behind the Hortmans' property.  (*Id.* ¶ 17.)  As he fled, Boelter discarded various pieces of evidence:  he threw the Beretta 92 nine-millimeter semiautomatic pistol he used to murder the Hortmans into the pond; he discarded another Beretta 92 pistol used in his attempted murder of the Hoffmans by dropping the disassembled frame and slide components into the grass near the walking path; near that second Beretta pistol, he also dropped three magazines loaded with ammunition, a replica firearm painted yellow to resemble a Taser device, a holster, a ballistic vest, and a flashlight.  (*Id.*)

Once Boelter was out of the Hortmans' neighborhood, he entered a gas station in Brooklyn Center at approximately 5:00 a.m.  (*Id.* ¶ 18.)  He bought a cowboy hat to disguise himself.  (*Id.*)

8

He then traveled back to a house where he rented a room in north Minneapolis. (*Id.*) Boelter broke into another SUV he owned to retrieve a backpack that contained his laptop computer. (*Id.*)[1] Boelter accessed his cell phone, which he had left powered on at the house, during his murders and attempted murders. (*See id.*) He sent text messages to his family, apologizing in general terms for what he had done the night before. (*See id.*) Boelter then shut the phone off. (*Id.*) He then discarded it into the bed of a stranger's pickup truck parked on the street. (*Id.*)

Boelter traveled to a nearby McDonald's. (*Id.*) He opened his laptop and connected to the McDonald's wifi at approximately 7:00 am. (*Id.*) He visited the InfoWars and YouTube websites, then searched "mn news" on Google. (*Id.*)

At a nearby bus stop, Boelter approached a stranger who was at that point unaware of the shootings at the Hoffman and Hortman residences. (*Id.* ¶ 19.) Boelter asked to buy the man's e-bike. (*Id.*) The man agreed to sell it to him along with a 2011 Buick Regal car with transmission problems for cash. (*Id.*) They traveled together from the bus stop to the man's home, then to a bank for Boelter to withdraw cash, and then back to the man's home again where they completed the transaction. (*Id.*) Shortly after noon, Boelter departed the man's home in the Buick, with the e-bike loaded in the back. (*Id.*)

Boelter drove the Buick toward Sibley County, the county in which his family home was located, in Green Isle. At approximately 5:00 p.m., while Boelter was still in flight, he opened his laptop and accessed a spreadsheet titled "meminfo.xls." (*Id.* ¶ 21.) The

---

[1] Boelter lacked the keys to the second SUV because he'd left them in the SUV he abandoned at the Hortmans' house.

9

spreadsheet contained a list of the members of the Minnesota House of Representatives, including personal addresses and phone numbers for certain representatives. (*Id.*) He then opened a different spreadsheet titled "MN House Members 2025," which also contained address and phone information for various representatives. (*Id.*)

Once in Sibley County, he abandoned the car on a rural road. (*Id.* ¶ 22.) In the car Boelter left his laptop, along with a letter he addressed to FBI Director Kash Patel. Boelter admitted to the shootings in his letter. (*Id.* ¶ 23.) He said he'd pointed an "AK pistol" at the New Hope police officer he'd seen outside Ann Rest's house, while emphasizing how many police he could have killed during his shootings:

> You should notice how I didn't fire one round at any police officers and boy did I have plenty of opportunity. Ask for the report on how many weapons and ammunition I had with me. Cops were pulling up right next to me in their vehicles and *I had an AK pistol aimed right at her head* and I could have left a pile of cops dead but I did shoot 1 bullet towards law enforcement. You can ask them. Because I support the police and don't want to see them hurt. But if they are hurting my wife + or kids next time I won't give them a pass.

(*Id.* (emphasis added).)

Boelter—who had looked at the news after the shootings when connected to the McDonald's wifi—complained in the letter that his crimes had not received enough news coverage:

> [A]sk Tim Walz why they kept the shots silent from the media when they first happened. Not a word in the press about it. Why? They needed to get their stories figured out first so everyone was on the same page about "what happened."

(*Id.*) Boelter also made various false assertions of having off-the-books U.S. military training and having been recruited for a secret assassination effort by the governor of

Minnesota.  (*Id.*)

At that point traveling by e-bike and on foot, Boelter made his way toward his Green Isle home.

**B.     *Law enforcement conducted a successful statewide manhunt.***

As Boelter fled after the Hortman shooting, law enforcement conducted a massive and successful statewide manhunt began for Boelter.  (*Id.* ¶ 20.)  The effort was led by FBI and the Minnesota Bureau of Criminal Apprehension, in close partnership with ATF, the Brooklyn Park Police Department, the Minneapolis Police Department, the Hennepin County Sherriff's Office, Champlin Police Department, and the New Hope Police Department, as well as several other state and local partners.

Law enforcement immediately identified Boelter as the murderer based on identifying information found inside the SUV he abandoned on the Hortman driveway. (*Id.*)  Inside that SUV, agents recovered five firearms that included semiautomatic assault-style rifles and pistols, multiple magazines loaded with ammunition, several notebooks containing Boelter's handwritten research for the offenses, and copies of flyers displaying the words "No Kings."  (*Id.*)  Among the recovered firearms was a Zastava AK-47-style pistol left on the front passenger seat.  (*Id.*)  The safety was off.  (*Id.*)

As the morning progressed, agents located and interviewed the man who sold Boelter the e-bike and car, searched the home where Boelter rented a room, identified and searched a nearby storage unit rented by Boelter, found the phone that Boelter discarded into a stranger's pickup truck bed, interviewed Boelter's family and his roommates, and followed up on countless tips.  (*See id.*)

11

Regarding Boelter's storage unit, surveillance video showed Boelter had accessed the unit on June 13, 2025—the day before the shootings. In the video, Boelter carried a dark-colored duffle bag. When agents searched the unit, they found a dark-colored duffle bag. Inside the duffle bag officers found five new body bags in the original packaging. The storage unit also contained multiple empty soft-sided rifle cases, firearms cleaning supplies, a heavy-duty tarp, a partially used can of black spray paint, fireworks, and three gasoline cans. (*Id.*) The gas cans were filled with gas. (*Id.*)

After midnight, in the early morning of June 15, law enforcement received a tip of a possible sighting of Boelter riding an e-bike in a rural area near his family residence in Green Isle, Minnesota. (*Id.* ¶ 22.) At approximately 6:00 a.m., agents found the abandoned Buick, with the laptop and the letter to the FBI Director. (*Id.*) At approximately 5 p.m., Boelter was seen on a trail camera a half-mile from his Green Isle home. (*Id.*) About 8 p.m., agents found Boelter's e-bike, abandoned. (*Id.*) At 8:21 p.m., a woman reported seeing Boelter in tall grass near his home. (*Id.*) Minutes later, agents using a drone camera spotted Boelter. (*Id.*) Agents tracked Boelter for nearly an hour as he first ran and then crawled away, until he was surrounded. (*Id.*) He surrendered. (*Id.*) On his person, agents found a loaded .357 caliber revolver, an additional 35 rounds of ammunition, a knife, a machete, and $1,923 in cash. (*Id.*)

IV.    **Investigation revealed Boelter acted alone and thoroughly prepared for the assassinations.**

After Boelter's arrest, agents continued to investigate Boelter's assassinations. They learned that Boelter had acted alone and no one had prior knowledge of his plans. (*Id.* ¶ 7.) Boelter's statements in his letter to the FBI Director were also false—Boelter did not act on behalf of any government or any public authority.

Agents identified records and evidence of Boelter purchasing the items used during the June 14 shootings: realistic face masks, brown wigs, red-and-blue emergency-style police lights, multiple types of ammunition, flashlights, a replica firearm (like the one painted yellow to appear like a Taser), a license plate frame, adhesive letters spelling "POLICE," a backpack, and two identical GPS devices. Surveillance video showed him spending approximately 13 minutes at an office-supply store copying and printing a stack of documents.

One of Boelter's GPS devices, when later recovered, showed he had input into the device the home addresses belonging to Melissa Hortman, John Hoffman, Ann Rest, and Kristin Bahner, as well as other state legislators. (*Id.*) The data on the GPS device indicated he had in fact traveled to the Hortman, Hoffman, Rest, and Bahner residences on June 14, 2025, but there was no data to suggest he had traveled to the homes of other legislators.

The investigation also showed that Boelter had done extensive research to identify intended victims, including the use of online people-search website, online digital maps, and other internet sources to locate and gather information about the victims. (*Id.*) He recorded his research across a number of notebooks. (*Id.*) In the notebooks Boelter jotted

13

notes about dozens and dozens of public officials, mainly from Minnesota, and almost entirely Democrats.

Law enforcement's review of Boelter's internet activity showed that prior to his attacks he was focused on the June 14, 2025 No Kings rally scheduled to take place at the Minnesota State Capitol. On June 12, he viewed a map of the Minnesota State Capitol grounds and a flyer for the rally. On June 12 and 13, he searched the internet for "No Kings." One of those searches led him to click on a Yahoo! News article titled "Hundreds of 'No Kings' protests planned nationwide this Saturday in response to Trump's military parade." One minute later, he searched for "no Kings Minnesota," which resulted in a visit to a Fox 9 News article titled "No Kings protest to rally against Trump planned for St. Paul on Saturday." The next website he visited was the organizing page for the rally.

His internet and text-message history also showed a focus on the balance of power between the political parties in the Minnesota and elsewhere where power was closely divided. (*Id.* ¶¶ 26, 27.) He texted his friends articles about the Republican U.S. House majority being "in Danger," commenting that "Democrats steal enough elections to tip the balance of power." He expressed concern to a friend that in the Wisconsin legislature, Democrats "may shift 4 house seats to Democrats." He complained to the same friend that in Minnesota "one party through questionable elections holds the house, senate, and Governor's seat to have total control and make any laws they want." He repeatedly searched for information about the narrowly divided Minnesota Legislature:

- "how many members are there from each party ion Minnesota House of Representatives,"
- "make up of the Minnesota Senate,"

14

- "Current makeup of the hpouse of representatives,"

- "how many frim each party in the mn senate," and

- "ratio of republicans to democrats in the MN house."

Then, at 3:42 p.m., less than 11 hours before Boelter arrived at the Hoffmans' door, Boelter sent his family a long, rambling text message about politics. He expressed concern for "large protests planned for this Saturday all across the U.S." by those opposed to the president. He asked his family to "pray[] that something takes the wind out of these protest sails." He complained about Democrats and the opponents of the president regarding the conflict with Iran, the war in Ukraine, theft of government funds, immigration policy, judicial integrity, and election integrity. (*See id.* ¶ 26.)

## V.    Boelter falsely claimed he shot at the Hoffmans' feet and arms.

After Boelter's arrest, while in custody at the Sherburne County Jail, Boelter engaged in a text-message interview with a journalist on August 11, 2025, where he discussed the Hoffman shooting. Joseph M. Hanneman, *Exclusive: Assassination Suspect Vance Boelter Tells STUNNING Inside Story About Shooting*, Blaze Media (Aug. 12, 2025).[2] Boelter told the journalist it was never his intention to shoot of kill anyone; he planned to conduct a citizen's arrest that went "horribly wrong." *Id.*

Boelter told the journalist he fired at the Hoffmans out of necessity after they tried to grab his gun. He claimed he deliberately aimed at the ground to avoid killing them:

> As soon as I said it was a robbery, the senator got wide-eyed and closed the 5 ft between us and started to grab me. . . . After he grabbed me then his

---

[2]    https://www.theblaze.com/news/exclusive-assassination-suspect-vance-boelter-tells-stunning-inside-story-about-shooting.

wife came over and grabbed me too. . . . [T]hen his daughter came forward and grabbed me also. So I had six arms on me and realized I'm going to lose control of any shots [that] were fired. . . . They all three had grabbed me before my gun in a matter of seconds. So I could have started shooting at people's heads because they were all right by me, but I just aimed my gun down between them and me at the ground and started shooting. I started aiming in between us at the floor, hoping I would not shoot my own foot[.] . . . But there were six arms on me at that point and one also on my shooting arm. My guess is if it ever comes out where the senator and his wife were hit will be in their arms, legs, and feet, but I have no idea.

*Id.* All of this was false. After being pushed out of the house, Boelter shot through the Hoffmans' front door, not in a scrum with the Hoffmans. And Boelter shot at their upper bodies, not at their legs; he hit Senator Hoffman repeatedly in the chest and Yvette in the abdomen and hip.

Boelter also told the journalist he initially "wasn't expecting to do [his] citizen's arrests until August." *Id.* He did not explain why he moved up his attack.

## SENTENCING GUIDELINES

**I.      The Guidelines recommend a sentence of life plus a consecutive 20-year term.**

The PSR accurately represents the Guidelines, which are as contemplated by the parties in the plea agreement: a sentence of life imprisonment with a consecutive 20-year term of imprisonment. (PSR ¶ 122; Plea Agreement at 15 ¶ 7(k), June 11, 2026, ECF No. 47.)

16

**II.**     **Federal law authorizes two consecutive life terms plus a consecutive 40-year term, as recommended by the parties.**

Federal law authorizes consecutive life sentences plus a consecutive 40-year term, as recommended by the parties.  District courts have the discretion to impose one sentence "concurrently or consecutively" to another sentence.  18 U.S.C. § 3584(a).  Such a decision is "based on the same § 3553(a) factors as other sentencing decisions."  *United States v. Boyum*, 54 F.4th 1012, 1016 (8th Cir. 2022) (quoting *United States v. Becker*, 636 F.3d 402, 408 (8th Cir. 2011)).

With respect to the sentencing on the § 924(c) and § 924(j) counts that Boelter committed, the PSR raises the potential significance of the Supreme Court's decision in *Barrett v. United States*, 607 U.S. 128 (2026).  *Barrett*—which was decided while this case was pending, in January 2026—held that when § 924(c)(1)(A)(i) and § 924(j) are charged based on the same underlying conduct, the offenses merge and a district court may not enter convictions on both offenses.  *Id.* at 139–41, 149.  But that decision does not constrain the Court's authority in this case, for two reasons.

*First*, *Barrett* relates only to § 924(c)(1)(A)(i) offenses, which are the default § 924(c) offenses, while Boelter pleaded guilty to § 924(c)(1)(A)(iii), which adds punishment beyond the default offense if a defendant discharges a firearm.  The distinction matters, because § 924(j) requires proof of only a violation of "subsection (c)," and Congress's inclusion of additional punishment for the discharge of a firearm may indicate its intention to authorize the entry convictions under both § 924(j) and § 924(c)(1)(A)(iii).  This issue was expressly raised by Justice Thomas at the *Barrett* oral argument.  *Barrett*

17

Oral Arg. Tr. 5:14–20, 58:9–13.[3]  The defendant-petitioner's counsel conceded to the Court that "perhaps[] this could go either way," while opposing counsel asserted they would "have an easier argument" if their case had involved subsection (iii).  *Id.*  All of this resulted in the *Barrett* Court expressly cabining its decision to only § 924(c)(1)(A)(i):

> We express no view as to whether the same is true as to other versions of the § 924(c) offense, as Barrett was convicted under § 924(c)(1)(A)(i).  Put differently, while we recognize that § 924(c) can be violated in a number of ways, this case involves only the base offense found at § 924(c)(1)(A)(i).  Our holding therefore applies only to that clause.

*Barrett*, 607 U.S. at 139 n.10.  So *Barrett* by its reasoning and by its terms does not resolve whether any of Boelter's § 924(c)(1)(A)(iii) counts merge with his § 924(j) counts.  The upshot is that *Barrett* does not constrain the Court's ability to issue the sentence requested by the parties.

Alternatively, even if *Barrett* did govern—which it does not—and it required the merger of Counts 3, 4, and 5, the Court would still have the legal authority to issue the parties' top-line recommended sentence under the available counts.  For example, the Court could reach the parties' recommendation by issuing consecutive life sentences under Counts 1 and 4, a consecutive 20 year-term under Count 2, and then another consecutive 20-year term under Count 6.[4]

---

[3] https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/24-5774_6jf7.pdf.

[4] The government stands by its stipulations in the plea agreement but raises these legal possibilities to make the Court aware of the bounds of its authority.

18

| Count | Parties' Recommendation | *Barrett* Sentencing Options |
|---|---|---|
| 1: Stalking of Melissa Hortman | life (concurrent with Count 3; consecutive to all other counts) | life (concurrent with Count 3; consecutive to all other counts) |
| 2: Stalking of John Hoffman | 20 years | 20 years |
| 3: § 924(j) Murder of Melissa Hortman | life (concurrent with Count 1; consecutive to all other counts) | *merge with Count 4* |
| 4: § 924(j) Murder of Mark Hortman | life (consecutive to all other counts) | life (consecutive to all other counts) |
| 5: § 924(c)(1)(A)(iii) Shooting of Melissa and Mark Hortman | 10 years (consecutive to all other counts) | *merge with Count 4* |
| 6: § 924(c)(1)(A)(iii) Shooting of John and Yvette Hoffman and Attempted Shooting of Hope Hoffman | 10 years (consecutive to all other counts) | *20 years (consecutive to all other counts)* |
| **Total** | **2 consecutive life terms plus 40 years consecutive** | **2 consecutive life terms plus 40 years consecutive** |

In sum, the Court has full authority under the law to issue a sentence of two consecutive life terms plus a consecutive 40-year term.

19

**THE APPROPRIATE SENTENCE**

**I.     Boelter's crimes are among the most serious ever presented to the Court.**

Vance Boelter's crimes reach the absolute heights of seriousness.

**A.     *Boelter's murders and attempted murders had a devastating effect on the victims.***

Boelter's crimes caused extraordinary and permanent harm.  He murdered Melissa and Mark Hortman in their home.  He repeatedly shot John and Yvette Hoffman multiple times at their home and left them with life-threatening injuries.  He also attempted to kill their daughter, Hope, who came face-to-face with the gun Boelter used to shoot her parents.

These crimes were extensively planned.  Boelter researched elected officials and their homes and family makeups.  He armed himself, wore body armor, disguised himself as a law-enforcement officer, and traveled to his victims' residences in the middle of the night.  He used the appearance of lawful authority to bring unsuspecting families to their doors with the intent to kill them.  The resulting harm extends well beyond the number of charges or the number of bullets fired.  Boelter murdered two loving parents, attempted to kill more, devastated two families, and targeted public officials through violence because of their public service.  It was an act of political violence that struck at the core of representative government.

1.     Melissa and Mark Hortman

In a matter of seconds, Sophie and Colin Hortman lost both of their parents. Grandparents lost a daughter and son, siblings lost a brother and daughter, and a large loving family lost people whose presence can never be replaced. An entire family has been scarred for life.  Mark and Melissa were deliberately killed together, inside the family

20

home, by a man who had selected Melissa for murder because she was an elected official. Boelter took from Sophie and Colin every future moment they should have had with their parents. Melissa and Mark will not be present at weddings, births, holidays, professional achievements, illnesses, or the ordinary occasions when adult children still call their parents for advice. Their future grandchildren will know Melissa and Mark only through photographs, stories, and the memories of others.

The loss is not limited to significant milestones. It includes the everyday parts of family life that cannot be recreated: a conversation in the kitchen, a familiar voice on the telephone, a shared meal, or simply spending time together in the home. Those losses will continue for the rest of Sophie's and Colin's lives, and all of the family and friends who loved Mark and Melissa.

Boelter violated the Hortman family's sense of home. Their house was not simply the location of the murders. It was the home where Sophie and Colin were raised. It had been the center of the family's private life and the place where Melissa and Mark could set aside the demands of public office and welcome their family and friends. The kitchen was an especially important part of that home. After the Hortmans renovated it, Melissa returned to baking with renewed enthusiasm, often baking about a cake each week and sharing blueberry pies that her family and friends enjoyed. She expressed her love through those acts of care and generosity that were uniquely Melissa. Colin had hoped she would bake his wedding cake. Boelter took that gift from the family, destroying a home filled with family memories and robbing them of gatherings that were yet to come.

Boelter even deprived the Hortman family of their beloved golden retriever, Gilbert. Melissa originally trained Gilbert as service dog, but after being found too friendly for that role, Gilbert became the family pet.

Colin has publicly described the painful reality that his future children will never know Mark and Melissa as grandparents. Sophie and Colin have also described a grief that was not ordinary, complicated by public attention, a prolonged crime-scene and remediation process that was left for Colin to untangle, and the knowledge that their parents were intentionally hunted because Melissa had devoted her life to public service.

These facts are not offered for sentiment alone. They show the full measure of what Boelter destroyed. Boelter did not simply end two lives. He eliminated the center of a family and deprived two children of both parents at once. These details matter because Melissa and Mark were more than public figures and more than the victims identified in the counts of conviction. To Sophie and Colin, they were simply Mom and Dad. Boelter converted that loving home into the scene of their parents' murders and left an entire family to carry the resulting sorrow for the rest of their lives.

Melissa Hortman devoted much of her adult life to public service. She served approximately two decades in the Minnesota House of Representatives, including six years as Speaker of the House. Her legislative work affected Minnesotans across the State. She helped enact legislation involving education, school meals, paid family and medical leave, transportation, energy, housing, and other matters touching daily lives. As Minnesota House Speaker, she also helped pass public safety legislation for PTSD treatment and duty disability care for police officers, firefighters, and paramedics. She also helped negotiate

22

budgets and legislative agreements during periods of divided government. Minnesota legislators have described her as one of the most consequential speakers in the history of the State House.  Her service did not end at the Capitol.  In her early legal career, she represented low-income tenants at Mid-Minnesota Legal Aid. She volunteered in schools and community organizations.  She and Mark also volunteered with Helping Paws, an organization that trained service dogs for veterans and persons with disabilities.

Mark Hortman likewise lived a life of accomplishment, service, and family devotion.  He earned a degree in physics and an MBA, building a successful career in technology. He mentored young people, volunteered with Twin Cities Habitat for Humanity, and helped Melissa train service dogs. Long before their public lives, Mark and Melissa first met in Washington D.C., through their shared commitment to community service.  Mark was a husband, father, friend, and neighbor who supported Melissa throughout a demanding public career, though his life stood complete on its own merits. He was a man of diverse interests who loved learning, brewing beer with Colin, shooting pool, baking sourdough bread, mountain biking, and was always devoted to his family. Boelter ended all of that.  He took Melissa's future service and Mark's future contributions. He took years they should have had with each other, with their children, and with the people who loved them.

### 2. John, Yvette, and Hope Hoffman

Boelter's conduct also permanently altered the lives of John, Yvette, and Hope Hoffman.  By pretending to be a police officer, Boelter induced the family to come to the

23

door in the middle of the night.  When they recognized that he was not an officer and attempted to protect themselves, Boelter forced his way forward and opened fire.

John and Yvette were shot multiple times and sustained life-threatening injuries. The fact that they survived does not reduce the seriousness of Boelter's conduct.  He intended to kill them.  Their survival resulted from their daughter Hope's immediate call to 911, emergency intervention, and extensive medical treatment.

John and Yvette have endured serious physical pain, medical procedures, rehabilitation, and continuing consequences from their injuries.  The full weight of their injuries and enduring trauma are laid bare in their victim impact statements.  Their injuries have affected not only their health, but every part of their lives.  They are reminded of the attack everyday by visible and invisible wounds and simple activities that are forever altered.  Everyday moments such as retrieving the mail or answering the door are now forever altered for the Hoffman family. Boelter imposed medical uncertainty, physical limitations, emotional distress, and a lasting loss of security inside their own home.  The sentence must account for those continuing harms.

Hope Hoffman was not struck by a bullet, but she was unquestionably a victim of Boelter's attack.  She witnessed both of her parents being shot and lying in their home bleeding.  Boelter pointed his weapon at her and tried to shoot her as well.  She then called 911 for help while her parents lay gravely wounded.  The absence of a physical wound does not capture what Hope experienced.  She watched a gunman attempt to kill her parents and was forced to confront the possibility that her parents would die in front of her.

Hope's actions in turn helped save her parents and alerted law enforcement to the broader attack. Her courage prevented Boelter from accomplishing everything he intended. But her courage does not erase the pain, trauma, and loss of security that Boelter imposed upon this family.

### B.    *Boelter committed political assassination.*

The harm to the Hortman and Hoffman families is itself sufficient to support the maximum sentence. But Boelter's crimes also caused a broader public harm. Boelter selected elected officials with the intent to commit multiple murders. He researched their work and families, armed himself, assumed the appearance of a police officer, and went to their homes intending to kill them. He sought to silence public servants with violence. There is no other way to put it: these acts were an attack on representative democracy itself.

Boelter chose to commit his murders at these lawmakers' homes—the places where their spouses and children lived and where they were entitled to feel safest. Boelter's selection of the victims transformed the offenses into an attack not merely upon particular individuals, but upon representative government itself. Public officials expect criticism, protest, political opposition, and even vigorous debate. Those are part of a functioning democracy. But they should not have to accept that service in elected office places their spouses, children, and homes in lethal danger. Here, Boelter substituted violence for democratic decision-making. He used violence in an effort to displace the cornerstones of the republic.

Violence directed at elected officials does not affect only the people who are

attacked.  It sends a message to every person serving in public office, and to anyone considering public service, that political participation may expose an entire family to deadly threats or violence.  It can intimidate, discourage citizens from seeking office, and cause public servants to make decisions under fear of potential violence.

Boelter also committed his murders with full knowledge that the inevitable result of his killings would be a shift in the balance of power in the Minnesota Legislature.  Boelter closely followed the near-even party division in the Legislature.  In the half year preceding his crimes, the Legislature's party division was a frequent focus in the press.  The 2024 election results left the Minnesota House deadlocked between the parties, with 67 members each.  One of the winning Democratic House candidates was declared ineligible, allowing Republicans a temporary one-seat majority until a new Democrat could be seated following a March 2025 special election.  After that, the House returned to a tie, which lasted until Boelter's murder of Speaker Hortman.

Similarly, Democrats in the Minnesota Senate held a one-seat majority, 34 seats to 33.  That thin majority was threatened by the fact that one of the party's senators, still in office at the time, had recently been convicted of burglary.  In March 2025, a Republican senator resigned due to criminal activity, then was quickly replaced by another Republican.  The 34-33 Democratic majority remained at the time of Boelter's crimes.

Boelter closely followed these issues.  He was aware of the party breakdown.  And he knew that if he had been successful in all of his attempted murders that night, he would have killed at least two Minnesota senators (Hoffman and Rest) and at least two Minnesota

26

House members (Hortman and Bahner), and the balance of power would have shifted in both houses of the Minnesota Legislature.

* * *

Melissa Hortman's career illustrates what Boelter attacked. She worked through elections, legislation, debate, negotiation, and compromise. She operated within democratic institutions even when the process was difficult and the disagreements were substantial. Boelter rejected that core American process and attempted to replace it with fear and lethal force. Her life was a testament to the power of democratic governance; his crime was a direct assault on the very foundation of our rule of law.

### C.    Boelter sought to kill more state legislators.

Boelter sought to kill more state legislators. He murdered the Hortmans. He also intended to murder the Hoffmans, Representative Bahner, and Senator Rest. And that is not where he intended to stop. He had other legislators' addresses typed into his GPS. He opened his spreadsheet of House member addresses after his killings, while in flight, before he had been caught.

Had Hope Hoffman not called 911, had the New Hope police officer not stood between Boelter and Senator Rest's home, and had officers not separated Boelter from his SUV at the Hortman residence, he likely would have murdered more state legislators.

### D.    *Boelter pointed a firearm at police and threatened law enforcement.*

Boelter also pointed an AK-style pistol at the New Hope police officer who confronted him at Senator Rest's home. When the officer pulled up alongside Boelter, they rolled down their windows, with the officer asking Boelter a question, and Boelter ignoring her. Later, he recalled the moment in his letter to the FBI Director: "Cops were pulling up right next to me in their vehicles and I had an AK pistol aimed right at her head and I could have left a pile of cops dead." (PSR ¶ 23.) In fact, officers later found an AK-style pistol on the passenger seat of Boelter's SUV. The safety was off. (*Id.* ¶ 20.) It was the pistol that Boelter pointed at the New Hope officer's head from within his SUV, unbeknownst to her.

Boelter also threatened police in his letter to the FBI Director. That letter, which Boelter left for law enforcement while he was still at large, repeatedly noted how he was able to kill the officers pursuing him: "I didn't fire one round at any police officers and boy did I have plenty of opportunity. Ask for the report on how many weapons and ammunition I had with me." (PSR ¶ 23.) "I could have left a pile of cops dead." (*Id.*) Though he claimed he didn't want to see police "hurt," he also made clear that if officers "are hurting my wife + or kids next time I won't give them a pass." (*Id.*) That was a threat.

Boelter also misused the appearance of law enforcement to carry out the attacks. A police uniform ordinarily communicates protection and public service. Boelter exploited that trust and used it to gain access to his victims. That choice increased the danger to the victims and undermined the trust on which legitimate law enforcement depends. By weaponizing the symbols of law enforcement, Boelter converted a universal sign of

28

protection and service into an instrument of murder, striking at the public trust that holds our communities together.

### E.    Boelter falsely minimized his attempts to kill the Hoffmans.

Boelter falsely minimized his attempts to kill the Hoffmans.  He told the media that he had no intention of shooting them, and he did so only out of necessity when they put hands on him.  Hanneman, *supra.*  He claimed he intentionally shot at the ground, and at their feet and arms to avoid killing them.  *Id.*  That was false.  Boelter shot all nine of his gunshots at the Hoffman home through the front door, after he was pushed to the other side of the door.  His shots were not at their arms and feet—he shot Senator Hoffman repeatedly in the chest, and he shot Yvette in the abdomen and hip.  Boelter aimed to kill.

## II.    General deterrence requires the lengthiest term of imprisonment.

General deterrence demands a sentence that reflects the societal gravity of these crimes.  An attack on elected leaders in their homes does not merely injure individual victims.  It threatens to introduce fear into the democratic process, chilling public participation and discouraging citizens from seeking office.  Impersonating law enforcement to execute political assassinations further compromises the public trust essential to community safety.  The sentence must establish that political disagreement can never be expressed through lethal force and ensuring that anyone who subverts democratic institutions or intimidate public servants through violence will be met with the severest measure of federal justice.

No sentence can return Melissa and Mark to their children.  No sentence can erase the Hoffmans' injuries or remove Hope's memory of the attack.  And no sentence can

29

restore the sense of safety the defendant took from both families.  But the sentence can and must make clear that political disagreement provides no justification for stalking, terrorizing, or murdering public officials and their families.

## III.   The requested sentence is necessary to avoid sentencing disparities.

Any sentence below life would create unwarranted sentencing disparities.  U.S. Sentencing Commission data shows that during the last five years, 131 defendants have been sentenced under similar guidelines to Boelter—under § 2A1.1, with a total offense level of 43—the max—and a criminal history category of I.  (PSR ¶ 123.)  The median sentence for this group was 470 months, which is how the Sentencing Commission records life sentences in its database.  (*Id.* ¶ 123 n.6.)  That strongly suggests that these similarly situated individuals all received life sentences, and any sentence below life for Boelter would create unwarranted sentencing disparities.

## **CONCLUSION**

Vance Boelter should be sentenced to two consecutive terms of life imprisonment to be followed by a consecutive term of 40 years of imprisonment for his political assassination of Speaker Melissa Hortman, his murder of her husband Mark, his attempted political assassination of John Hoffman, and his attempt to murder Yvette and Hope Hoffman. The astonishing damage that Boelter caused to his victims and to the State of Minnesota will never be cured. Justice requires that Boelter never be free ever again.

Dated: July 21, 2026

Respectfully Submitted,

DANIEL N. ROSEN
United States Attorney

/s/ *Matthew D. Forbes*
Bradley M. Endicott
Matthew D. Forbes
Assistant U.S. Attorneys

31